**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALPHA DELTA CHI-DELTA CHAPTER, a sorority at San Diego State University; ALPHA GAMMA OMEGA-EPSILON CHAPTER, a fraternity at San Diego State University; MELISSA PEREA, an individual, FKA Melissa Travis; JACKIE LEWIS, an individual; JAMES ROSENBERG, an individual; DAVID SHOKAIR, an individual,

*Plaintiffs-Appellants,*

and

EVERY NATION CAMPUS MINISTRIES AT SAN DIEGO STATE UNIVERSITY, a student organization at San Diego State University; EVERY NATION CAMPUS MINISTRIES AT LONG BEACH STATE UNIVERSITY, a student organization at California State University, Long Beach; HALEY HAWTHORNE, an individual; TREVOR STOKES, an individual; GWENDOLYN DAVIS, an individual,

*Plaintiffs,*

v.

CHARLES B. REED, in his official capacity as Chancellor of the California State University;

9979

STEVEN L. WEBER, in his official
capacity as President of San Diego
State University; DOUGLAS CASE,
individually and in his official
capacity as Coordinator of
Fraternity and Sorority Life at San
Diego State University,
                    *Defendants-Appellees,*

                    and

F. KING ALEXANDER, in his official
capacity as President of California
State University, Long Beach;
JEFFREY KLAUS, individually and in
his official capacity as Director of
Student Life and Development at
California State University, Long
Beach,
                    *Defendants.*

No. 09-55299

D.C. No.
3:05-cv-02186-
LAB-AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
November 1, 2010—Pasadena, California

Filed August 2, 2011

Before: Harry Pregerson, Kenneth F. Ripple,* and
Susan P. Graber, Circuit Judges.

*The Honorable Kenneth F. Ripple, Senior Circuit Judge for the Seventh Circuit, sitting by designation.

Opinion by Judge Pregerson;
Concurrence by Judge Ripple

**COUNSEL**

Benjamin W. Bull and Jeremy D. Tedesco, Alliance Defense Fund, Scottsdale, Arizona; Jordan W. Lorence (argued), Alliance Defense Fund, Washington, D.C.; David A. French, Alliance Defense Fund, Columbia, Tennessee; and John M. Stewart, Law Offices of Stewart & Stewart, Orange, California, for the plaintiffs-appellants.

Susan Westover, California State University, Office of General Counsel, Long Beach, California, for the defendants-appellees.

Steven W. Fitschen, Virginia Beach, Virginia, for amicus The National Legal Foundation.

Elizabeth Gill, American Civil Liberties Union Foundation, Lesbian Gay Bisexual Transgender Project, San Francisco, California; David Blair-Loy, American Civil Liberties Union Foundation of San Diego and Imperial Counties, San Diego, California; James D. Esseks and Rose A. Saxe, American Civil Liberties Union Foundation, Lesbian Gay Bisexual Transgender Project, New York, New York; and Daniel Mach, American Civil Liberties Union Foundation, Program on Freedom of Religion and Belief, Washington, D.C., for amici American Civil Liberties Union and American Civil Liberties Union of San Diego and Imperial Counties.

## OPINION

PREGERSON, Circuit Judge:

The Supreme Court held in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez* that a public law school does not violate the Constitution when it "condition[s] its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students." 130 S. Ct. 2971, 2978 (2010). The Court referred to the open membership requirement as an "all-comers policy" and concluded that such a policy was a "reasonable, viewpoint-neutral condition on access to the student-organization forum." *Id.* The Court further held that the all-comers policy did not violate the Free Exercise Clause of the First Amendment. *Id.* at 2995 n.27.

The Court expressly declined to address whether these holdings would extend to a narrower nondiscrimination policy that, instead of prohibiting *all* membership restrictions, prohibited membership restrictions only on certain specified bases, for example, race, gender, religion, and sexual orientation. *See id.* at 2982, 2984. The constitutionality of such a policy is the issue before us in this case. We conclude that the narrower policy is constitutional. We hold, however, that Plaintiffs have raised a triable issue of fact as to whether the narrower policy was selectively enforced in this particular case, thereby violating Plaintiffs' rights under the First and Fourteenth Amendments. We affirm in part and reverse in part, and remand to the district court for further proceedings.

## BACKGROUND

Plaintiffs are Alpha Delta Chi, a Christian sorority, and Alpha Gamma Omega, a Christian fraternity, as well as sev-

eral of their officers, at San Diego State University ("San Diego State") in California.[1]

Alpha Delta Chi, the sorority, has several religious requirements for its members, including "personal acceptance of Jesus Christ as Savior and Lord," "active participation in Christian service," and "regular attendance or membership in an evangelical church."

Alpha Gamma Omega, the fraternity, requires its members "to sincerely want to know Jesus Christ as their Lord and Savior," and its officers must sign a "Statement of Faith" reading:

> I hearby publicly confess my belief in the Lord Jesus Christ as God and only Savior and give witness to the regenerating power of the Holy Spirit in my life. I will make it a purpose of my life to continue in fellowship with God through prayer and reading of the Holy Scriptures.

Alpha Gamma Omega officers' beliefs and practices must be "consistent with orthodox Christian beliefs."

Plaintiffs have repeatedly submitted applications for official recognition in San Diego State's student organization program. There are approximately 115 officially recognized student organizations at San Diego State. San Diego State requires these groups to submit a signed "Student Organization On-Campus Recognition Application," and on-campus recognition must be renewed each year. Officially recognized student organizations receive a number of benefits, such as university funding, use of San Diego State's name and logo, access to campus office space and meeting rooms, free public-

---

[1]Plaintiffs Every Nation Campus Ministries at San Diego State University, Every Nation Campus Ministries at Long Beach State University, Haley Hawthorne, Trevor Stokes, and Gwendolyn Davis, are not participating in this appeal.

ity in school publications, and participation in various special university events. Officially recognized groups may set up informational tables and banners in the student union and participate in various events for recruiting new members. Further, officially recognized fraternities and sororities may be members of one of four fraternity and sorority councils, which grants them access to recruitment fairs, leadership conferences, and social activities organized by the councils.

Each time Plaintiffs have applied for official recognition, they have been denied by San Diego State administrators because of Plaintiffs' requirement that their members and officers profess a specific religious belief, namely, Christianity. These membership requirements conflict with San Diego State's nondiscrimination policy, which San Diego State requires all officially recognized student organizations to include in their bylaws. The policy states:

> On-campus status will not be granted to any student organization whose application is incomplete or restricts membership or eligibility to hold appointed or elected student officer positions in the campus-recognized chapter or group on the basis of race, sex, color, age, religion, national origin, marital status, sexual orientation, physical or mental handicap, ancestry, or medical condition, except as explicitly exempted under federal law.

This policy reflects the California State University system's Non-Discrimination Regulation, which states:

> No campus shall recognize any fraternity, sorority, living group, honor society, or other student organization which discriminates on the basis of race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability. The prohibition on membership policies that discriminate on the basis of gender does not apply to

> social fraternities or sororities or to other university living groups.

5 Cal. Code Regs. tit. 5, § 41500.

Because Plaintiffs were denied official recognition by San Diego State, they were denied the benefits of official recognition. They still may hand out flyers and post signs to recruit new members, but only in areas open to all groups, whether recognized or not, such as the "free speech steps" of the student union and the wall next to the university bookstore. Plaintiffs still may use university rooms for meetings and events, but not for free or at reduced prices, as officially recognized groups are able to do.

Plaintiffs brought suit in federal district court challenging San Diego State's nondiscrimination policy under the First and Fourteenth Amendments. Plaintiffs and Defendants filed cross-motions for summary judgment, and the district court granted summary judgment on all counts in Defendants' favor while denying Plaintiffs' motion. Plaintiffs appeal from that judgment.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 921 (9th Cir. 2011). "We view the evidence in a light most favorable to the non-moving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). Although in this case Plaintiffs and Defendants each contend that there are no genuine issues of material fact and summary judgment is appropriate, we may still reverse a grant of summary judgment if we find that triable facts remain. *See Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 (9th Cir. 2000).

DISCUSSION

## I. Free Speech and Freedom of Expressive Association

Plaintiffs argue that San Diego State's requirement that they comply with the nondiscrimination policy forces them to accept non-Christian members who will "significantly impair the message [Plaintiffs] joined together to promote." Appellants' Br. at 16. This, Plaintiffs claim, violates their First Amendment right to expressive association.[2] Plaintiffs also argue that San Diego State has excluded them from an expressive forum on the basis of their religious viewpoint, in violation of their free speech rights.

The parties in their briefs disagree as to the proper standard of review for these claims. After the briefs were filed, however, the Supreme Court decided *Christian Legal Society*, which held that when a university excludes a student organization from official recognition for refusing to comply with the school's nondiscrimination policy, both freedom of speech and freedom of expressive association challenges are properly analyzed under the limited-public-forum doctrine. 130 S. Ct. at 2984-86 ("[W]e are persuaded that our limited-public-forum precedents adequately respect both [the student group's] speech and expressive-association rights, and fairly balance those rights against [the university's] interests as property owner and educational institution.").

---

[2]To be protected by the First Amendment's right to expressive association, "a group must engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). San Diego State does not dispute that Alpha Delta Chi and Alpha Gamma Omega engage in expression, so we proceed on the assumption that Plaintiffs may invoke their right to expressive association. *But see Christian Legal Soc'y*, 130 S. Ct. at 3012 (Alito, J., dissenting) (arguing that, although the First Amendment should protect the right of student religious groups to exclude members who do not share their faith, such protection would not extend to fraternities and sororities).

**[1]** A limited public forum is government property opened for use by " 'certain groups or dedicated solely to the discussion of certain subjects.' " *Id.* at 2984 n.11 (quoting *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009)). In a limited public forum, the government may impose restrictions that are "reasonable in light of the purpose served by the forum," so long as the government does not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks omitted).

**[2]** *Christian Legal Society* held that a law school's student organization program is a limited public forum. 130 S. Ct. at 2984 n.12. Plaintiffs attempt to distinguish that case, contending that San Diego State's student organization program is not a limited public forum, but a designated public forum. A designated public forum is government property "open[ed] for indiscriminate public use for communicative purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993). Speech in a designated public forum has significantly greater protection than speech in a limited public forum—restrictions on speech in a designated public forum are subject to strict scrutiny and, therefore, " 'must be narrowly tailored to serve a compelling government interest.' " *Christian Legal Soc'y*, 130 S. Ct. at 2984 n.11 (quoting *Pleasant Grove City*, 129 S. Ct. at 1132).

**[3]** We see no material distinction between San Diego State's student organization program and the student organization program discussed in *Christian Legal Society* and, therefore, conclude that San Diego State's program is also a limited public forum. Like San Diego State, the university in *Christian Legal Society* provided benefits to student groups within its program, such as financial assistance; access to university newsletters, bulletin boards, and meeting rooms; and the use of the university's name and logo. *Id.* at 2979. In exchange, the student groups agreed to abide by certain conditions, including an approval process and the school's nondis-

crimination policy. *Id.* Thus, both the program in *Christian Legal Society* and San Diego State's program are not "open for indiscriminate public use," *Lamb's Chapel*, 508 U.S. at 392, but are instead limited to certain groups—student organizations—which is the hallmark of a limited public forum, *see Christian Legal Soc'y*, 130 S. Ct. at 2984 n.11. The fact that both the school in *Christian Legal Society* and San Diego State require student groups to obtain university approval is further indication that the student organization programs are limited public forums. *See Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 909 (9th Cir. 2007) ("Requiring prior permission for access to [a] forum demonstrates that a public forum has not been created by designation."), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

**[4]** Because we conclude that San Diego State's student organization program is a limited public forum, we apply the same analysis to both Plaintiffs' free speech and expressive association claims: Plaintiffs' exclusion from San Diego State's student organization program is permissible if San Diego State's requirement that student groups adhere to the nondiscrimination policy is (1) reasonable in light of the purpose of the forum; and (2) viewpoint neutral. 130 S. Ct. at 2988.

## A.   Reasonableness

In *Truth v. Kent School District*, we held that a high school's requirement that student organizations comply with a nondiscrimination policy was a reasonable restriction in light of the purpose of the school's student organization program. 542 F.3d 634, 649 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 2866 (2009) and 129 S. Ct. 2889 (2009), *overruled on other grounds by Los Angeles County v. Humphries*, 131 S. Ct. 447 (2010). The policy prohibited the school—and, by extension, student organizations officially approved by the

school—from discriminating on various grounds such as race, gender, and religion. *Id.* at 639.

To determine whether this policy was reasonable in light of the purpose of the student organization program, we looked to the program's constitution. *Id.* at 649. The constitution listed various purposes for the program, including developing good citizenship, promoting harmonious relationships, facilitating student and faculty expression, and encouraging students to obey, honor, and sustain state and local laws and school rules. *Id.* We read these "broad statements of purpose" to mean that the purpose of the student organization program was to "advance the school's basic pedagogical goals." *Id.* We then noted that the Supreme Court had "emphasized that part of a school's mission is to instill in students the 'shared values of a civilized social order,' which includes instilling the value of non-discrimination." *Id.* (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)). Thus, we concluded that the school's nondiscrimination policy aligned with the school's pedagogical goals and was a reasonable limitation in light of the purpose of the student organization program. *See id.*

As in *Truth*, we look to San Diego State's Student Organizations Handbook to determine the purpose of the student organization program. The section of the handbook entitled "Principles of Community" is filled with references to diversity and nondiscrimination: "Underlying San Diego State's educational goals are basic values that include . . . freedom from discrimination . . . . [We] affirm [our] positive commitment toward diversity . . . . We encourage every student organization to make a conscious effort to undertake recruitment efforts to ensure diversity within the group's membership and to take steps to reach populations currently underrepresented. . . . No organization will direct recruitment . . . toward any one group (i.e. racial, ethnic, gender, etc.) of potential members. . . . We . . . challenge you to express yourself in a man-

ner that promotes and maintains the ideals of respect, equality, diversity, and freedom from harassment."

**[5]** These statements make clear that one of the intended purposes of San Diego State's student organization program is to promote diversity and nondiscrimination. These statements are far more explicit than the "broad statements of purpose" in *Truth*—the statements in *Truth* did not expressly mention nondiscrimination. *See* 542 F.3d at 649. Requiring student groups to adhere to a nondiscrimination policy is reasonable in light of San Diego State's intended purpose.

**[6]** Also relevant to the analysis of reasonableness is whether Plaintiffs have alternative avenues of communication besides the forum from which they have been excluded. In *Christian Legal Society*, the Supreme Court found the university's nondiscrimination policy "all the more creditworthy" because the plaintiffs in that case still had many avenues for expressing their message. 130 S. Ct. at 2991. The university offered the plaintiffs access to meeting facilities, chalkboards, and generally available bulletin boards. *Id.* The Court noted that, although the plaintiffs were denied use of the student organization program's special means of communication, "the advent of electronic media and social-networking sites reduces the importance of those channels." *Id.* The Court specifically cited references to internet message groups, email, websites, Google, and MySpace. *Id.* The Court deemed the availability of other means of communication "significant" to limited-public-forum analysis. *Id.*

**[7]** As in *Christian Legal Society*, San Diego State allows non-recognized groups like Plaintiffs to use campus facilities for meetings, to set up tables and displays in public areas, and to distribute literature. Plaintiffs also have access to all the non-university electronic resources mentioned by the Supreme Court, as well as new resources invented since then. Thus, San Diego State's policy should be deemed as "creditworthy" as the policy in *Christian Legal Society*.

**[8]** Therefore, San Diego State's nondiscrimination policy is reasonable in light of the student organization program's purpose of promoting diversity and nondiscrimination.[3]

## B. Viewpoint Neutrality

Plaintiffs contend that San Diego State's nondiscrimination policy, as written, discriminates against Plaintiffs' viewpoint. Alternatively, Plaintiffs argue that, even if the nondiscrimination policy is viewpoint neutral on its face, San Diego State has applied it in a discriminatory fashion, exempting some groups from the policy while requiring other groups to comply with it. We find that the policy is viewpoint neutral as written, but that there are triable issues of fact as to whether San Diego State has selectively enforced its nondiscrimination policy.

### 1. The nondiscrimination policy as written

" 'Viewpoint discrimination is . . . an egregious form of content discrimination,' and occurs when 'the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction [on speech].' " *Truth*, 542 F.3d at 649-50 (ellipsis in original) (quoting *Rosenberger*, 515 U.S. at 829). A restriction on speech is unconstitutional if it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). How-

---

[3]Plaintiffs also point out that a stated purpose of San Diego State's forum is to "increase the range of viewpoints advocated in the marketplace of ideas on campus." Plaintiffs argue that the nondiscrimination policy is not reasonable given this purpose, because eliminating groups such as Plaintiffs actually decreases the number of viewpoints being expressed. This argument was made and rejected in *Christian Legal Society*, which stated that "a State's restriction on access to a limited public forum 'need not be the most reasonable or the only reasonable limitation.' " 130 S. Ct. at 2992 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808 (1985)).

ever, a restriction that " 'serves purposes unrelated to the content of expression' " and only incidentally burdens some speakers, messages, or viewpoints, " 'is deemed neutral.' " *Christian Legal Soc'y*, 130 S. Ct. at 2994 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "We thus look to the government's purpose as the threshold consideration." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994).

In the context of a student organization program, the Supreme Court has made clear that an "all-comers" policy that requires *all* student groups to accept *all* members does not discriminate on the basis of viewpoint. *Christian Legal Soc'y*, 130 S. Ct. at 2993. Such a policy " 'is justified without reference to the content [or viewpoint] of the regulated speech.' " *Id.* at 2994 (alteration in original) (quoting *Ward*, 491 U.S. at 791). The "all-comers requirement draws no distinction between groups based on their message or perspective." *Id.* at 2993.

Plaintiffs contend that the reasoning and holding of *Christian Legal Society* do not apply, however, when a school's policy prohibits only *certain* membership requirements, such as those based on race, gender, or religion, rather than prohibiting all membership requirements, as an all-comers policy does. The more limited nondiscrimination policy at issue in this case, Plaintiffs argue, discriminates on the basis of viewpoint because it allows secular belief-based discrimination while prohibiting religious belief-based discrimination. For example, under this more limited policy, a student Republican organization could permissibly exclude Democrats because the policy does not forbid discrimination on the basis of political belief, but a Christian group could not exclude a Muslim student because that would discriminate on the basis of religious belief.

Indeed, San Diego State stipulates that some officially recognized student groups at the university restrict membership

to those who believe in the group's purpose, or "agree with the particular ideology, belief, or philosophy the group seeks to promote." For example, the Immigrant Rights Coalition requires members to "hold the same values regarding immigrant rights as the organization." The San Diego Socialists at San Diego State require students to be in "agreement with our purpose." The Hispanic Business Student Association opens membership to those "who support the goals and objectives" of the organization. Plaintiffs argue that San Diego State is discriminating against their viewpoint by allowing these secular groups to discriminate on the basis of belief, while prohibiting Plaintiffs from doing so on the basis of their religious beliefs.

Plaintiffs' argument, while seemingly compelling at first glance, does not survive closer scrutiny. We accept Plaintiffs' assertion that San Diego State's nondiscrimination policy incidentally burdens groups that wish to exclude others on the basis of religion, but does not burden groups that do not exclude or exclude on bases not prohibited by the policy. But this assertion is insufficient to prove viewpoint discrimination, because Plaintiffs have put forth no evidence that San Diego State implemented its nondiscrimination policy for the *purpose* of suppressing Plaintiffs' viewpoint, or indeed of restricting any sort of expression at all. *See Truth*, 542 F.3d at 647 (upholding high school's requirement that plaintiff student group comply with nondiscrimination regulations because group "ha[d] not shown that [the school district] justifie[d] its non-discrimination policies with reference to the content of [the group's] message").

**[9]** San Diego State asserts that the purpose of its policy, which closely tracks the nondiscrimination policy applied to the entire California State University system, is to prevent discrimination and to ensure that the school's resources are "open to all interested students without regard to special protected classifications." Appellees' Br. at 27. As the Supreme Court has made clear, antidiscrimination laws intended to

ensure equal access to the benefits of society serve goals "unrelated to the suppression of expression" and are neutral as to both content and viewpoint. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984) (holding that a state law prohibiting discrimination on the basis of race, color, creed, religion, disability, national origin, or sex "does not aim at the suppression of speech [and] does not distinguish between prohibited and permitted activity on the basis of viewpoint"); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995) (stating that a public accommodations law forbidding discrimination on the basis of sexual orientation and other grounds did not, "on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds"). Like the laws challenged in *Roberts* and *Hurley*, San Diego State's nondiscrimination policy does not "target speech or discriminate on the basis of its content," but instead serves to remove access barriers imposed against groups that have historically been excluded.

We reached a similar conclusion in *Truth*, a case with facts very close to those of the instant case. In *Truth*, we held that a high school's student organization program did not discriminate on the basis of viewpoint when it denied access to a religious student group for refusing to comply with a nondiscrimination policy prohibiting exclusion on enumerated grounds. 542 F.3d at 650. Like Alpha Delta Chi and Alpha Gamma Omega, the student group in *Truth* required its members to be Christian, which violated the school district's nondiscrimination policy prohibiting discrimination based on "race, creed,[4] color, national origin, sex, marital status, previous arrest . . . , incarceration, or physical, sensory or mental

---

[4]The district court interpreted the reference to "creed" to mean that the policy prohibited discrimination on the basis of religion. *Truth*, 542 F.3d at 639. This ruling was not challenged on appeal. *Id.*

disabilities." *Id.* at 639, 645 (ellipsis in original). The student group in *Truth* challenged its exclusion from the student organization program as a violation of various constitutional and statutory provisions, including its First Amendment rights of free speech and expressive association. *Id.* at 637.

We held that the school's nondiscrimination policy in *Truth* was neutral as to content and viewpoint.[5] *Id.* at 647, 650. While acknowledging that the student group may have been attempting to convey a message via its discriminatory conduct, we found that the student group "ha[d] not shown that the [school district] justifie[d] its non-discrimination policies with reference to the content" of that message. *Id.* at 647. We concluded that the school's denying the plaintiff student group access to the student organization program was "based on [the student group's] discriminatory membership criteria, not the religious 'content of the speech.' " *Id.* at 645. Thus, "the school [was] not denying [the religious student group] access based solely on its religious viewpoint, but rather on its refusal to comply with the [school district's] nondiscrimination policy."[6] *Id.* at 650. *Truth*, along with *Roberts*

---

[5]Much of our analysis in *Truth* focused on whether the school's exclusion of the plaintiff student group violated the Equal Access Act, 20 U.S.C. § 4071(a). *See* 542 F.3d at 644-48. That analysis is nonetheless relevant to the question of content and viewpoint neutrality, because the Equal Access Act, like the First Amendment, forbids "denial of equal access, or fair opportunity, or discrimination" based on the content (or viewpoint) of a group's speech. *Id.* at 645. Thus, in analyzing the plaintiffs' claim under the Equal Access Act, we necessarily had to decide whether the school's nondiscrimination policy was content neutral. Content neutrality for purposes of the Equal Access Act is identical to content neutrality for First Amendment claims; in *Truth*, we relied on First Amendment cases to guide our analysis of content neutrality under the Equal Access Act. *See id.* at 645-46 (citing *Ward*, 491 U.S. at 791; *Widmar v. Vincent*, 454 U.S. 263, 269-70 (1981); *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005)).

[6]In *Truth*, as in the instant case, several approved student groups had non-religious belief-based membership requirements. *See* 542 F.3d at 648 (noting that "several [student] clubs, such as the EarthCorps and the Gay-Straight Alliance, require their members to support a specific political cause"). We did not address the existence of these groups in our constitutional analysis. *See id.* at 650.

and *Hurley*, compels the conclusion that San Diego State's nondiscrimination policy is neutral as to content and viewpoint.

[10] It is true that content-neutral antidiscrimination laws can nonetheless violate the First Amendment right of expressive association when used to force a private group to accept members who materially interfere with the message the group wishes to express. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000); *Hurley*, 515 U.S. at 572-73. Plaintiffs argue that requiring them to accept non-Christians into their groups "forces them to say what they do not want to say." Appellants' Br. at 48. Were San Diego State compelling Plaintiffs to include non-Christians, Plaintiffs might have a sound argument. But as *Christian Legal Society* makes clear, there is a difference "between policies that require action and those that withhold benefits." 130 S. Ct. at 2986. The Supreme Court declined to apply the line of expressive association cases— including *Dale* and *Hurley*—in the context of a student organization program, because the university was not forcing student groups to accept unwanted members, but only conditioning certain benefits on the adoption of a nondiscrimination policy. *Id.* Instead, the Court analyzed the plaintiffs' First Amendment challenge under the limited-public-forum doctrine, which permits reasonable restrictions on expression so long as they are viewpoint neutral. *Id.* at 2984, 2986. Under this reasoning, San Diego State's reasonable and viewpoint-neutral requirement that recognized student groups comply with its nondiscrimination policy does not violate Plaintiffs' right to expressive association. Plaintiffs are free to express any message they wish, and may include or exclude members on whatever basis they like; they simply cannot oblige the university to subsidize them as they do so.

Again, we do not doubt that, regardless of San Diego State's purpose in enacting its nondiscrimination policy, the policy will have the effect of burdening some groups more than others. But the fact that a "regulation has a differential

impact on groups wishing to enforce exclusionary member-ship policies" does not render it unconstitutional. *Id.* at 2994 (internal quotation marks omitted). " 'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.' " *Id.* (quoting *Ward*, 491 U.S. at 791).

**[11]** Thus, we hold that San Diego State's nondiscrimina-tion policy is viewpoint neutral as written. Constitutionally speaking, therefore, San Diego State's policy is not materially different from the content-neutral all-comers policy approved in *Christian Legal Society*, and must be similarly upheld against First Amendment challenge.

## 2.    The nondiscrimination policy as applied

**[12]** A nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uni-formly. *See Truth*, 542 F.3d at 650. In *Truth*, we expressed concern that "at least two groups, the Men's Honor Club and the Girl[s'] Honor Club, were granted [official] recognition even though their membership is based on gender, a protected ground under the [school district's nondiscrimination] poli-cy." *Id.* at 648. "Thus, to the extent [the plaintiff student group] alleges that the [school district] provided waivers to these groups while denying them to others, and that decision was made on the basis of religion or the religious content of speech, [the plaintiffs have] raised a triable issue of fact." *Id.* We reversed the district court's summary judgment and remanded "for further proceedings on this limited issue." *Id.* Although we were not convinced the school district had acted improperly, remand was necessary because "the record [was] devoid of any evidence as to the actual reason that the [school district] granted a non-discrimination waiver to the Men's and Girl[s'] Honor Clubs." *Id.* at 648 N.2.[7]

---

[7]The text of this paragraph comes from *Truth*'s discussion of the Equal Access Act. However, we applied similar, if less fully articulated, reason-ing in our First Amendment discussion. *See Truth*, 542 F.3d at 650.

In this case, Plaintiffs also offer evidence that San Diego State has granted official recognition to some religious student groups even though those groups, like Plaintiffs, restrict membership or eligibility to hold office based on religious belief. For example, the Catholic Newman Center's application for official recognition by San Diego State provides that its officers must be "members, in good standing, with the Catholic Church." Further, some non-religious but officially recognized groups appear to discriminate on prohibited grounds, in contravention of the policy. For instance, the African Student Drama Association's constitution limits its leadership positions to students from Africa.

**[13]** As in *Truth*, the evidence that some student groups have been granted an exemption from the nondiscrimination policy raises a triable issue of fact. *See* 542 F.3d at 650. We note that Plaintiffs' characterization of the evidence may not be correct. For example, it is possible that these groups were approved inadvertently because of administrative oversight, or that these groups have, despite the language in their applications, agreed to abide by the nondiscrimination policy. But as it stands now, the record does not adequately explain why some official student groups at San Diego State appear to have membership requirements that violate the school's nondiscrimination policy. We therefore reverse in part the district court's grant of summary judgment in favor of Defendants on Plaintiffs' free speech and expressive association claims. We remand for consideration of the question whether San Diego State has (1) exempted certain student groups from the nondiscrimination policy; and (2) declined to grant Plaintiffs such an exemption because of Plaintiffs' religious viewpoint.

## II.   Free Exercise Clause and Equal Protection

In addition to their free speech and freedom of expressive association claims, Plaintiffs argue that San Diego State is targeting them because of their religious beliefs in violation of their right to the free exercise of their religion. Plaintiffs also

argue that San Diego State is treating them differently from other student groups in violation of their right to equal protection under the law. As with their free speech and expression claims, Plaintiffs raise a triable issue of fact.

Under the Free Exercise Clause of the First Amendment, the government may not, among other things, "impose special disabilities on the basis of religious views or religious status." *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990). However, "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Christian Legal Soc'y*, 130 S. Ct. at 2995 n.27 (citing *Smith*, 494 U.S. at 878-82).

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A showing that a group "was singled out for unequal treatment on the basis of religion" may support a valid equal protection argument. *Truth*, 542 F.3d at 650.

**[14]** San Diego State's nondiscrimination policy, as written, is a rule of general application. It does not target religious belief or conduct, and does not "impose special disabilities" on Plaintiffs or other religious groups. Any burden on religion is incidental to the general application of the policy. Thus, as written, San Diego State's policy violates neither the Free Exercise Clause nor the Equal Protection Clause. However, given the evidence that San Diego State may have granted certain groups exemptions from the policy, there remains a question whether Plaintiffs have been treated differently because of their religious status. *See Truth*, 542 F.3d at 650. Therefore, we reverse the district court's grant of summary judgment in favor of Defendants on Plaintiffs' free exercise and equal protection claims. We remand for further findings as to whether San Diego State in fact exempted other student

groups from the nondiscrimination policy, but refused to exempt Plaintiffs because of their religious beliefs.

## CONCLUSION

San Diego State's nondiscrimination policy, as written, is viewpoint neutral and reasonable in light of the purpose of the student organization program. Thus, the university's policy does not violate Plaintiffs' rights of free speech and expressive association. Moreover, the policy does not violate Plaintiffs' rights to free exercise of religion and equal protection under the law. But the evidence raises a triable issue of fact as to whether San Diego State has exempted certain groups from the policy while not granting such an exemption to Plaintiffs. We therefore remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED.** The parties shall bear their own costs on appeal.

---

RIPPLE, Circuit Judge, concurring:

I concur in the judgment because faithful adherence to the doctrines of stare decisis and precedent requires me to do so. I write separately because this case presents an important issue of First Amendment jurisprudence, which the Supreme Court explicitly reserved in *Christian Legal Society v. Martinez*, 130 S. Ct. 2971, 2984 & n.10 (2010). Although this circuit has answered this question in *Truth v. Kent School District*, 542 F.3d 634, 645-47 (9th Cir. 2008), it is still an open question at the national level. Here, the factual ambiguities that prompt this court to remand to the district court may dilute the focus of the constitutional question, at least momentarily; nevertheless, it may well be that, at some later point,

this case will be an appropriate case for further Supreme
Court review.

As the majority points out, this case is not controlled by the
majority opinion in *Christian Legal Society*; SDSU has not
conditioned official recognition of clubs on an organization's
adopting an "all-comers" policy. *See* slip op. at 9985. Rather,
it has required that organizations not discriminate in member-
ship or leadership on specified grounds: "race, sex, color, age,
religion, national origin, marital status, sexual orientation,
physical or mental handicap, ancestry, or medical condition."
ER 87 ¶ 18. Under this policy, most clubs can limit their
membership to those who share a common purpose or view:
Vegan students, who believe that the institution is not accom-
modating adequately their dietary preferences, may form a
student group restricted to vegans and, under the policy, gain
official recognition. Clubs whose memberships are defined by
issues involving "protected" categories, however, are required
to welcome into their ranks and leadership those who do not
share the group's perspective: Homosexual students, who
have suffered discrimination or ostracism, may not both limit
their membership to homosexuals and enjoy the benefits of
official recognition. The policy dilutes the ability of students
who fall into "protected" categories to band together for
mutual support and discourse.

For many groups, the intrusive burden established by this
requirement can be assuaged partially by defining the group
or membership to include those who, although they do not
share the dominant, immutable characteristic, otherwise sym-
pathize with the group's views. Most groups dedicated to for-
warding the rights of a "protected" group are able to couch
their membership requirements in terms of shared beliefs, as
opposed to shared status. Opponents of violence against
women could limit their membership to all individuals dedi-
cated to eradicating physical, mental or emotional abuse
against female domestic partners. A gay, lesbian and trans-
gender students group could limit their membership to all

individuals dedicated to achieving equal political and social recognition of gay, lesbian and transgender persons.

Religious students, however, do not have this luxury—their shared beliefs coincide with their shared status. They cannot otherwise define themselves and not run afoul of the nondiscrimination policy. *See Truth*, 542 F.3d at 645 ("Even assuming that non-Christians would be able to comply with Truth's view of 'Christian character, Christian speech, Christian behavior and Christian conduct,' we hold that the requirement that members possess a 'true desire to . . . grow in a relationship with Jesus Christ' inherently excludes non-Christians."). The Catholic Newman Center cannot restrict its leadership— those who organize and lead weekly worship services—to members in good standing of the Catholic Church without violating the policy. Groups whose main purpose is to engage in the exercise of religious freedoms do not possess the same means of accommodating the heavy hand of the State.

The net result of this selective policy is therefore to marginalize in the life of the institution those activities, practices and discourses that are religiously based. While those who espouse other causes may control their membership and come together for mutual support, others, including those exercising one of our most fundamental liberties—the right to free exercise of one's religion—cannot, at least on equal terms.

On this basis, I concur in the judgment of the court.